FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA 02 JUN -5 AM 9:56
### SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SANDRA WYANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 00-JEO-2163-S |
| | ) | |
| BURLINGTON NORTHERN SANTA | ) | |
| FE RAILROAD, R.C. PATE, and | ) | |
| RANDY HARTZLER, | ) | **ENTERED** |
| | ) | |
| Defendants. | ) | JUN 5 2002 |

## MEMORANDUM OPINION

In this action, plaintiff Sandra Jean Wyant ("Wyant" or "the plaintiff"), an employee of Burlington Northern and Sante Fe Railway ("BNSF") asserts various claims against the BNSF, her immediate supervisor, Randy Hartzler ("Hartzler"), and a foreman, R.C. Pate ("Pate"), including that the defendants (1) violated the Equal Pay Act ("EPA"); (2) engaged in gender discrimination by disciplining male employees less harshly than her; (3) terminated her from her supervisory position and placed her on a five year ban from holding any supervisory position because of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; and, (4) conspired to remove her from her supervisory position because of her gender in violation of 42 U.S.C. § 1985(3). Wyant also raises claims under 42 U.S.C. § 1981, breach of contract, breach of the implied covenant of good faith and fair dealing, wrongful discharge, and outrage. Presently before the Court is the defendants' motion for summary judgment (doc. 25) and the defendants' motion to strike the plaintiff's affidavit (doc. 35). Upon due consideration, the motion to strike is due to be granted in part and denied in part and the motion for summary judgment is due to be granted.

40

## I. BACKGROUND

BNSF operates a terminal in Birmingham, Alabama. Operations are run by various individuals, including brakemen, switchmen, engineers, and conductors, who are supervised by a job foreman or conductor. The foreman and conductor report to a yardmaster. The yardmaster reports to the trainmaster, who, in turn, reports to a terminal manager. (Deposition of Randall Hartzler at 9).[1]

Wyant, a fifty-two year old white female, began her career with BNSF on April 14, 1970, as a clerk. (Doc. 32 at 1). After three years, Wyant desired a position as a yardmaster. Initially, she did not get the job. Instead, two male employees, with thirteen years of experience filled the openings. (Wyant Depo. at 35).[2] Before becoming a trainmaster, Wyant applied nearly twenty-five times for management positions, the majority of which were for the trainmaster and power control positions. (Complaint ¶ 8, Wyant Depo. at 37-38).

On August 15, 1995, Wyant became Trainmaster at BNSF's Birmingham terminal. (McGee Affidavit at ¶ 2).[3] In that position, Wyant oversaw train operations in and around BNSF's Birmingham terminal. (Id. at ¶ 3). In 1999, Wyant's annual salary was $62,496.00. (Wyant Depo. at 64). During the course of her job during the relevant period, Wyant received approximately six (6) satisfactory evaluations. (Complaint ¶ 9). Her immediate supervisor was Randy Hartzler. (Id.).

On or about June 22, 1999, Wyant received a request to move some train cars from the

---

[1] Excerpts of Hartzler's deposition are found in the record at document 27, exhibit E and document 33, tab P.

[2] Excerpts of her deposition is found in the record at document 27, exhibit B and at document 33, tab N.

[3] McGee's affidavit is located at document 27, exhibit C.

"industry ABC and interchange Jefferson Warriors." (Doc. 33, Ex. I, at 4). At about 7:00, Wyant, acting in her supervisory position, radioed the engineer, T.M. Nelson "to relay to [R.C.] Pate that we had 15 loads at ABC to pull and 19 cars at Jefferson Warrior to pull." (*Id.*). Nelson relayed the message to Pate, which he acknowledged. (*Id.*). At about 7:15, Wyant heard the crew call, indicating that they were coming out with 23 cars. (*Id.*). They had not picked up "the cars at the ABC or Jefferson Warrior, so they were instructed to pick them up before they came out. [At about 7:45,] they called for the signal at the big tank, and they still only had 23 cars." (*Id.*). Wyant requested a formal investigation of the crew, including Pate, for failure to comply with her instructions.

Following this incident, on June 23, 1999, Pate entered Wyant's office and leaned over Wyant's desk and yelled directly in her face over another incident that happened earlier in the day. (Doc. 33, Tab R (Wyant Affidavit), p.1). Wyant was intimidated because of Pate's size and his yelling. (*Id.*).

The hearing on the failure to follow instructions complaint was conducted on July 12, 1999. The crew was represented by the union in the proceeding. (Doc. 33, Ex. I, at 2). Wyant and Yardmaster Janice Burr testified. Burr was responsible for arranging the work schedule for the crews. She testified that she spoke with Pate and that he told her that he could "not pull the Jefferson Warrior cars" because they were in a hole and "couldn't come out." (*Id.* at 10). Wyant told Burr to tell Pate to "double up" to get the cars out. (*Id.*). She further testified that he (Pate) did not understand what she was telling him to do. (*Id.* at 10-11). Ultimately, Pate failed to bring the cars as requested. No disciplinary action was taken against the crew, including Pate.

(Wyant Aff. at 1).[4]

Wyant reported the June 23rd incident involving Pate to her supervisor and terminal manager, defendant Randy Hartzler. He told her to write a complaint regarding Pate; which she did. (*Id.* at 2). Hartzler handled the complaint. Pate was required to write a letter of apology to Wyant. (10/22/99 Wyant Aff. at 4).

On the weekend of October 16-17, 1999, Pate and another crew member had a problem with bugs or gnats on the switch engine they were operating. (*Id.*). When Wyant returned to work after the weekend, Pate asked her if the bug problem had been resolved. She replied that the problem had been resolved. She also, jokingly, said "Pate if you had brought better food in your lunch, [the bugs] would have left you alone." (*Id.*). Pate did not appreciate the comment so he reported it to Hartzler, telling him that he (Pate) took "great exception" to Wyant's comment. (Pate Depo. at 130).[5]

On October 19, 1999, Hartzler instructed Wyant to not make "any more derogatory comments to Pate, especially about bugs, and she acknowledged that, okay." (Hartzler Depo. at 22-24, 28-29).

On October 20, 1999, Wyant passed Pate in the hallway and patted him on the shoulders and asked him if he had "left the bugs at home today." (7/9/01 Wyant Aff. at 2). Though Wyant cannot remember Pate's specific response, his actions led her to believe that he did not like the comment. (*Id.*). Wyant then said something to the effect that "I guess you left your sense of humor at home too. " (*Id.*). Later that same day, Wyant was called to a meeting involving

---

[4] Wyant submitted four affidavits. They are all found at document 33, exhibits D (1/29/99 (one page)), E (10/22/99 (seven pages)), F (10/27/99 (one page)), and R (7/9/01 (five typewritten pages)).

[5] Pate's deposition excerpts are found at document 27, exhibit D.

Hartzler, Pate, and R.W. Sellers, who was there as Pate's Union representative. (*Id.*). Pate complained about the bug remarks and said that he had talked to an attorney prior to the meeting. (*Id.*). Pate then said that he was putting the company on notice that he was not going to tolerate any harassment. (*Id.*). Hartzler told Wyant that this kind of harassment would not be tolerated. (*Id.*). Wyant then left the meeting.

Hartzler and Pate continued talking after Wyant left. Pate told Hartzler that Wyant had been sexually harassing him for two or three years. (Hartzler Depo. at 41-42). This was the first time any such allegations had been made by Pate. He told Hartzler that over the past three (3) years Wyant touched him on his shoulder and thigh. He also alleged that Wyant ran her fingers through his hair. (*Id.* at 58).

Hartzler and his immediate supervisor, Tony Sarret, contacted Cathy McGee ("McGee"), the regional director of Human Resources for BNSF. They informed McGee that Pate had complained to Hartzler that Wyant had been sexually harassing Pate for nearly three years. (McGee Aff. at 1). McGee sent Kimberly Suitte ("Suitte"), the Human Resources Manager for BNSF's Birmingham terminal, to interview and take sworn statements of Pate, Wyant, and other employees. (*Id.* at ¶ 4).

On October 22, 1999, Suitte interviewed Wyant extensively about the bug issue and previous investigations and incidents that Pate and Wyant had been involved in . Suitte recorded several handwritten pages, which Wyant signed. (7/9/01 Wyant Aff. at 3). Wyant denied any knowledge of the basis of Pate's allegations of harassment over the last three years. (10/22/99 Wyant Aff. at 1 & 6).

Between October 27, 1999, and November 1, 1999, Suitte interviewed and took the

sworn statements from Pate and seven other co-workers in order to further the investigation and determine whether Pate's claims could be substantiated.  In her interview of Pate, he stated that Wyant has been sexually harassing him for at least 3 years.  She would touch him by "rub[ing] [his] shoulders;" taking his "cap off [and] run[ning] her fingers through [his] hair;" and rubbing his thigh, sitting beside him and "put[ting] her knees in the chair and lean[ing] over [his] shoulder [with] her breasts comm[ing] in contact w[ith his] back."  (Pate Aff. at 1-2).  She would also ask him about his home life.  (*Id.* at 2-3).  Pate named a number of witnesses to the events. He also complained that much of her conduct was an effort to get him to take her on a date.  (*Id.* 4-6).

Suitte interviewed Wyant on October 22 and 29, 1999.  Wyant told her, that to the best of her knowledge, she never rubbed or touched Pate's chest, hair or thigh.  She may have touched his shoulders, back or arm while talking with him, as she did with other crew members. (10/22/99 & 10/29/99 Wyant Affs.).

Suitte interviewed other potential witnesses.  Thomas Nelson stated that he saw Wyant "run her fingers through [Pate's] hair."  (Nelson Aff. at 1).[6]  Monte Mathews stated that he saw Wyant rub Pate's shoulders and touch his shoulders, chest, and thigh.  (Matthews Aff. at 1).[7] Danny Maddox stated that he saw Wyant touch Pate on the shoulder, rubbing the same, and he had seen her touch his head once.  (Maddox Aff. at 1).[8]  Elton Campbell stated that he saw

---

[6] Nelson's affidavit is found at document 33, tab B.  Nelson also made reference in his affidavit to other inapprproriate comments by Wyant.  (Nelson Aff. at 1).

[7] Matthews' affidavit is found at document 33, tab C.

[8] Maddox's affidavit is found at document 33, tab D.

"Wyant rub Pate's shoulders, like a message (sic)." (Campbell Aff. at 1).[9] Dennis Buzbee stated

that he saw Wyant rub Pate's shoulders, but he did not "think she meant anything by it because

she ha[d] done it to [him] and others.  It seems to be done in a non-threatening/friendly manner."

(Buzbee Aff. at 1).[10]  Jimmy Woods stated that Wyant "would massage [Pate's] neck, rub his

hair" in the "backup shack."  (Woods Aff.).[11]  He did not see her rub his chest or thigh.  (*Id.*).  He

had seen her do the same things in the conductor's lobby.  (*Id.*).  He also saw Wyant touch

Woods' hair, but he did not feel like it was of a sexual nature.  (*Id.*).  Mabrey Miller stated that he

saw Wyant "lean over Mr. Pate with her arm on his shoulder . . . one time."  (Miller Aff.).[12]

Wyant was giving Pate instructions at the time and she was using her other hand to point to a list.

(*Id.*).

        Suitte submitted the sworn statements to McGee.  Premised on BNSF's sexual

harassment policy and the existence of corroborating witnesses, Wyant was suspended with pay

pending the investigation.  McGee made the decision to terminate Wyant from her position as

Trainmaster and place Wyant on a five-year ban from seeking a supervisory position at BNSF.

(McGee Aff. at ¶ 9).  On November 2, 1999, Hartzler and Suitte met with Wyant and terminated

her from her exempt employment relationship, which included her supervisory position, due to

inappropriate behavior towards a subordinate employee.  (Doc. 33, Ex. A).  Wyant used her

seniority to return to a dispatcher position in Texas.  Her position as Trainmaster was filled by a

---

[9] Campbell's affidavit is found at document 33, tab E.

[10] Buzbee's affidavit is found at document 33, tab F.

[11] Woods' affidavit is found at document 33, tab G.

[12] Miller's affidavit is found at document 33, tab H.

white male who was about 23 years old with about three years experience with the railroad. (Doc. 32 at 4).

On November 16, 1999, Wyant filed an Internal Complaint at BNSF but did not receive a response. (Complaint ¶ 25). On the same day, Wyant filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Wyant's complaint to the EEOC alleged violations of Title VII and the Equal Pay Act. BNSF filed a response on March 21, 2000. (Doc. 33, Ex. B). On May 5, 2000, the EEOC issued a right to sue letter. (Complaint ¶ 26). On August 3, 2000, the plaintiff filed suit in this court.

## II. MOTION TO STRIKE PORTIONS OF WYANT'S AFFIDAVIT

### A. Generally

The defendants ask the court to strike portions of Wyant's affidavit because they fail to meet the requirements of Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE. Rule 56(e) states, in pertinent part, that affidavits in support of or in opposition to a motion for summary judgment ". . . shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). If a supporting or opposing affidavit fails to conform to Rule 56(e), the opposing party may move to strike the nonconforming portion or portions. *Ali v. City of Clearwater*, 915 F. Supp. 1231, 1236 (M.D. Fla. 1996), citing *Interfase Marketing, Inc. v. Pioneer Technologies Group, Inc.*, 1993 WL 229601, *2 (M.D. Fla. June 23, 1993), *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1529 (M.D. Fla.1989)).

The defendants assert in their motion to strike that portions of the affidavit are due to be

8

struck (1) because they irrelevant;[13] (2) to the extent they are based on her "best beliefs" (doc. 33, at 3); (3) because she attempts to compare herself to a union employee whose complaints are handled differently due to a collective bargaining agreement (*id*. at 5); and, (4) they constitute inadmissible hearsay.  Wyant did not file a reply to the motion to strike.

### B. Discussion Regarding the Purportedly Objectionable Portions

#### 1. Paragraph 1

The first paragraph at issue provides:[14]

> My name is Sandra Wyant.  I am a 52 year old white female employed by the Burlington Northern Sans [sic] Fe Railway Co.  I started my railroad career in 1970 and held various jobs over the years including clerk, caller, operator, yardmaster, dispatcher, assistant chief dispatcher, all with a satisfactory personal record (personnel file).  ~~After approximately 25 applications for a management position from 1993 until 1995, I was assigned a trainmaster position in Birmingham, Al in August 1995.~~  I was dismissed from this position in October 1999 due to the following circumstances and in what I believe to be an unjust termination and discriminatory actions on the part of the BNSF Railway Company.

(Doc. 35 at 2; 7/9/01 Wyant Aff. at ¶ 1).  BNSF argues that the objected-to sentence is due to be struck because it "bears no relation to the controversy."  (Doc. 35 at 3).  The court agrees, these incidents occurred at least four years before the complained-of matters.  They do not involve discipline matters, but relate to promotions.  The plaintiff has not suggested how they are relevant.  The first clause of the sentence is due to be struck.  The remainder of the sentence is relevant to the EPA claim.

---

[13] The defendant states that the evidence "bears no relation to the controversy."  (Doc. 35 at 3).

[14] The court has reproduced the objected-to portions of the affidavit for the convenience of the reader.  The "struck" portions are to identify individual sentences that are objected-to.

## 2. Paragraph 2

The second paragraph states: "The following [(affidavit)] is my statement based on my best beliefs and personal knowledge." (7/9/01 Wyant Aff. at ¶ 2). The defendant asserts that it is due to be struck to the extent it is based on Wyant's "best beliefs." (Doc. 35 at 3). The Eleventh Circuit Court of Appeals recently stated:

> The Rules are clear: "Supporting and opposing affidavits *shall* be made on personal knowledge." FED. R. CIV. P. 56(e) (emphasis added). Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, "upon information and belief"--instead of only knowledge– from raising genuine issues of fact sufficient to defeat summary judgment. *See Stewart v. Booker T. Washington Ins.,* 232 F.3d 844, 851 (11th Cir. 2000) ("upon information and belief" insufficient); *Fowler v. Southern Bell Tel. and Tel. Co.,* 343 F.2d 150, 154 (5th Cir. 1965) ("knowledge, information and belief" insufficient); *Robbins v. Gould,* 278 F.2d 116, 118 (5th Cir. 1960) ("knowledge and belief" insufficient). [ ] Likewise, an affidavit stating only that the affiant "believes" a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact. *Jameson v. Jameson,* 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge."); *see also Tavery v. United States,* 32 F.3d 1423, 1426 n. 4 (10th Cir. 1994); *Hansen v. Prentice-Hall, Inc.,* 788 F.2d 892, 894 (2d Cir. 1986). Even if the affidavit is otherwise based upon personal knowledge (that is, includes a blanket statement within the first few paragraphs to the effect that the affiant has "personal knowledge of the facts set forth in th[e] affidavit"), a statement that the affiant believes something is not in accordance with the Rule. *See Cermetek, Inc. v. Butler Avpak, Inc.,* 573 F.2d 1370, 1377 (9th Cir. 1978) (equating "I understand" statement in affidavit to inadmissible "I believe" statements and concluding that statement is inadmissible despite general averment to personal knowledge at beginning of affidavit). The district court's treatment of the "believe" portion of Hedge's statement in his affidavit--that Hedge "observed motion in the red car which I believe was [Davis] raising his hands towards the roof of his car in an attempt to surrender"--as sufficient to create a fact issue about raised hands was error. [ ]

*Pace v. Capobianco,* 283 F.3d 1275, 1278 -1279 (11th Cir. 2002) (footnotes omitted). Premised on *Pace,* the court will examine the remainder of the affidavit to determine whether it is premised on the plaintiff's "beliefs" or "personal knowledge."

### 3. Paragraphs 3 through 7

These paragraphs provide:

On June 22, switch crew with yard foreman Pate, failed to comply with a direct order from myself to pull all the cards from the North Belt Yard and Jefferson Warrior connection.  After it became evident that he had failed to comply with instructions, I wrote up the incident to my supervisor, Terminal Manager Randy Hartzler, and requested a formal investigation into the facts as is provided by the General Code of Operating Rules and the union agreements.  Mr. Hartzler agreed to set up an investigation.

On the evening of June 23, Mr. Pate came into my office about 9:00 PM.  By his manner, I suspected he was upset.  He then asks [sic] me if I was aware of the switching move he had just been required to make in the yard.  When I asked what that move was, he explained he had been required to shove his cars from the west end of track 19 to the east end to couple onto the cars on the east end.  I responded that I saw nothing wrong with the move.  He then became very excited, standing close to my desk and leaning over it cornering me while he waved his arms and yelled very loudly about how unsafe it was to ride a cut of cars 4000 feet to a joint.  I asked if he had been instructed to ride the cut of cars to a joint. He continued to yell and argue the fact that it was an unsafe move.  I continued to impress upon him that no one had required him to ride the cut of cars, but provided automobile transportation to protect the shove from the road, which was the common practice.

Then Mr. Pate started interrogating me as to why the cars were on the east end of the track and why they had left them there.  He was continuing to get louder and more excited.  This all was making me feel nervous and threatened, while knowing that I needed to appear calm and collected.  The fact that Mr. Pate is about 6'6" tall and 250 pounds added to my fear.  I told him that he should be more concerned with doing his work rather than what someone else was doing.  When he asked what I meant by that, I said, you failed to pull all the cards last night as instructed.  He started making excuses and [I] told him I felt there was no excuse.  He said, "Well, why don't you call an investigation to get this straightened out."  I told him that I had requested an investigation.  With that he stomped out of my office and apparently left work, because he did not finish his required computer work.

I reported this matter to Mr. Hartzler and he instructed me to give him a write up on the matter, which I did.  Mr. Hartzler did not hand this over to human resources for handling but chose to handle [it] on his level of command.

> The requested investigation was held on July 12, 1999. It included the, conducting officer, the switch crew, Mr. Pate, Mr. Maddox, Mr. Nelson, their union representatives, yardmaster, Ms [sic] Burr and myself as witnesses. During the investigation Ms [sic] Burr was asked 35 questions, I was asked 52 questions, Mr. Pate was asked 21 questions, Mr. Maddox was asked 20 questions, and Mr. Nelson was asked 24 questions. While Ms [sic] Burr corroborated my testimony, I felt that I was on trial. The switch crew received no discipline for failure to comply with instructions and Mr. Pate wrote me a letter for his harassing behavior on June 22. I felt the company had not upheld my position as trainmaster and my authority as a supervisor had been diminished.

(7/9/01 Wyant Aff. at 1-2; doc. 35 at 3-5). The defendants assert that this information is irrelevant because Pate is a union employee who is subject to a collective bargaining agreement; therefore the evidence is irrelevant. (Doc. 35 at 5). Because Wyant has not responded, the court must speculate as to the basis for the plaintiff's offer of such evidence. Regardless, the court finds that this information is not comparator evidence; at best, it is background information to place the events that led to her termination in context.

Rule 402 of the FEDERAL RULES OF EVIDENCE provides that all relevant evidence is admissible. FED. R. EVID. 402. However, as pointed out by the defendants, much of the material in this portion of the affidavit is not relevant as comparator evidence. To the extent it is foundational and background information that permits the court to place the applicable events in context, to exclude this information would be detrimental to both sides and would be inconsistent with the purpose and intent of the FEDERAL RULES OF EVIDENCE. *See* FED. R. EVID. 102. Accordingly, the motion is due to be denied in part on this challenge. The court will not, however, consider the information to the extent she asserts any opinion based on her belief.[15]

---

[15] By way of example, the court will not consider her statements that she felt she was on trial or that she felt the defendant was not supporting her.

12

### 4. Paragraph 10

Paragraph 10 states:

> Later that evening as Mr. Hartzler was leaving work, he stopped by my office and
> said Mr. Pate was upset about the bug remark. ~~My impression was that Mr.
> Hartzler felt it was a frivolous problem, but had to be endured~~.

(7/9/01 Wyant Aff. at 2; Doc. 35 at 5).  The defendants assert that the objected-to sentence is due

to be struck because it is based on "information and belief."  (Doc. 35 at 5).  The court agrees; it

is an improper conclusion.

### 5. Paragraph 13-14 and 19-21

These paragraphs state:

> Thur. Oct [sic] 21, Ms [sic] Kimberly Suitte, Human Resources contact from
> Memphis and working under Cathy McGee came to Birmingham to interview Mr.
> Pate.  As she was about to leave the office, ~~I asked her if I was going to get a turn
> to present my side of the story, and she responded there was nothing to talk about.
> Mr. Sellers told me that Pate would not talk to her~~.
>
> Fri. Oct [sic] 22, Ms [sic] Suitte interviewed me extensively about the bug issue
> and previous investigations and incidents that Mr. Pate and I had been involved
> in.  There was a total of about 7 hand written pages that Ms. Suitte recorded,
> which I signed and then went back to work. ~~About 30 minutes later, while~~
> yardmaster Faye Jackerson and I were going over the work to be completed that
> day, Ms [sic] Suitte came into my office. ~~She was very apologetic, saying how
> embarrassed she was, but there were a few more questions that she needed to ask
> me~~.  It had been on the back of one of her papers and she had overlooked it [sic]
>
> Fri. Oct [sic] 29, I was called into a 5:00 PM meeting with Suitte and Hartzler.
> Because of an interstate wreck I did not arrive until 5:30 PM, and then was kept
> waiting until 6:30 PM to meet with them.  Suitte questioned me again about
> touching Pate, and again I said I did not touch him in anything but a co-worker
> manner, on the shoulders, or arm.  I then requested to see the statements from the
> switchmen that had been interviewed. ~~She said that they had been mixed and not
> that conclusive~~.  Hartzler and Suite then presented me the letter temporarily
> holding me off.  I questioned the part about being ineligible for disability.  They
> explained that, often in this situation, people do something to claim disability.
> ~~Then Suite said, "not to be the grim reaper, but you may not have a job after the~~

13

~~investigation is complete.~~"

Tues. Nov [sic] 2, 1999 [sic] I was called in for a 1:00 PM appointment at Mr. Hartzler's office.  I was given a letter of termination at that time and requested that I turn in my pager, cell phone, etc.  I ask [sic] Ms [sic] Suitte how I would go about activating my seniority as a dispatcher, to which she had no idea.  ~~Then I asked about a moving package and procedure packet to which I was given no help.  Finally Ms [sic] Suitte said they could possibly furnish me with a U-haul.~~

Thur. Nov [sic] 4, Ms [sic] Suitte called to say I could get a moving package if I would sign a release.  Thinking she meant for furniture damage, I asked what kind of release.  She explained a release from retribution for discipline received [sic] I told her no.  She suggested I might want to contact an attorney.

(7/9/01 Wyant Aff. at 2-3; Doc. 35 at 6-7).  The defendants assert that the objected-to portions are inadmissible hearsay.

The general rule is that inadmissible hearsay cannot defeat a motion for summary judgment where there is no indication that it is reducible to a form that would be admissible at trial. *See Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135, *amended in part on rehearing*, 102 F.3d 1118 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S. Ct. 2453, 138 L. Ed. 2d 211 (1997).  An affidavit submitted in connection with a motion for summary judgment may contain hearsay statements that would be admissible at the trial under exceptions to the hearsay rule. *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2nd Cir. 1991).

The first statement in paragraph 13, regarding a purported comment by Suitte to Wyant that there was nothing to talk about, is hearsay, except to the extent it is offered for impeachment purposes, which is not relevant on a motion for summary judgment.  Accordingly, it is due to be stricken. The statement by Sellers concerning Pate is also inadmissible as hearsay.

The statement in paragraph 14 that Suitte was apologetic and embarrassed is hearsay. Wyant's assessment that Suitte was apologetic is also conclusory.

14

The first statement in paragraph 19, regarding Suitte's assessment of the interviews, is hearsay. The second statement, regarding "the grim reaper" comment, appears to be hearsay because it is an out of court statement by someone who was not a decision maker. More importantly, the statement adds nothing to the court's determination of the relevant issues even if it were allowed.

The statement in paragraph 20, regarding the moving package, is hearsay. Additionally, it adds nothing to the court's consideration of the relevant issues.

The 21st paragraph, dealing with comments by Suitte regarding a release, are hearsay. Again, they add nothing to the consideration of the present issues.

### 6. Paragraph 22 & 23

Paragraphs 22 and 23 provide:

> The loss of my position in Birmingham was disastrous. I lost wages, stock options, matching funds in the 401K, yearly bonus and ability to retire at age 55 if I choose to. I was 9 months away from being vested for company pension and the early retirement [sic] I had a 5-year ban placed on me from holding a future exempt job (management position). I had to move my son from HIS home, and this resulted in his attempted suicide, and later dropping out of school. I suffered mentally and physically from the stress of trying to resettle myself in another state and relearn the critical job of train dispatcher while under the added stress of moving and helping my 15-year [sic] son recover.

> Monetary losses figured from an outside source show at least $60,000 lost in salary for 10 years, $18,000 lost in 401k matching funds for 10 years, and pension loss at $59,196. This does not include the loss of yearly bonus and stock options. Nor does it take Into [sic] effect the possibility of promotion to higher-grade positions.

(7/9/01 Wyant Aff. at 3; Doc. 35 at 7-8). The defendants assert that theses paragraphs are due to be struck because Wyant's alleged damages are irrelevant to the present motion. (Doc. 35 at 8). The evidence is due to be struck except for the factual statements that show she suffered an

adverse employment action.

### 7. Paragraph 24

Paragraph 24 provides, "Do I believe the Railroad discriminated against women and was unfair and discriminatory toward me?  Yes, I definitely believe this with the reasons following:". (7/9/01 Wyant Aff. at 3; Doc. 35 at 8).  The defendants object, stating that this statement is due to be stricken because it is not based on personal knowledge.  The court finds that the statement is conclusory and due to be struck.

### 8. Paragraphs 25 & 26

These paragraphs state:

When I complained to Mr. Hartzler about Mr. Pate acting in a threatening and harassing manner, Hartzler chose to handle this on his management level, instead of going straight to Human Resources.  When I was accused of sexual harassment, Mr. Hartzler immediately called Human Resources, and that was 2 days before I found out I had been accused of sexual harassment.  ~~In doing research, it appears that most cases of discrimination and harassment are handled on a local level. One case as an example, in Tulsa [sic] Oklahoma, clerk Valerie Carr told me Trainmaster Mike Wacker sexually harassed her.  Wacker had been slapping her on the buttocks, and finally she complained to local management [sic] According to Ms [sic] Carr, Mr. Wisman and Mr. Rick Pennington had interviewed her and just couldn't believe that Wacker would do something like that.  They intimidated her from taking it above them to Human Resources and had Wacker write her a letter of apology.  They then continued to promoter [sic] Wacker from trainmaster, to Terminal Manager at Tulsa and he is now in Kansas City as a Superintendent.~~

~~I talked with Stephanie Kozar, a railroad police officer, about being harassed by Gary Lang in Cicero, Ill.  She told me he grabbed her in the crotch.  This was after repeated touching, unwanted hugs and telephone messages.  She went to Cathy McGee's office with a complaint [sic]  She was immediately taken out of the Cicero office and sent to Corwith yard, where the patrolmen would not take transfer from her, nor give her a great resume.  But all the positions were filled in their words, "by someone more closely matching the job description".  These positions were often filled by someone with less experience than I and always a male employee.~~

16

(7/9/01 Wyant Aff. at 3-4; Doc. 35 at 9).  The defendants assert that the stricken portions are

inadmissible hearsay.   The defendants are correct.  The statements are inadmissible in their

present form and they would not be admissible through Wyant.  They are clearly inadmissible

hearsay and, therefore, may not be considered on this motion.

### 9.  Paragraphs 27 & 28

These paragraphs state:

> On one occasion I was interviewed for a trainmaster position located in Memphis.
> Mr. Stimart arranged to interview me after work at the dispatcher office in
> Springfield, MO.  I had worn comfortable, inexpensive attire that day, which
> consisted of black cotton slacks, a cotton tank top and a white cotton blazer.
> During the interview, Mr. Stimart pointed out I would not be able to wear that
> type of attire while working as a trainmaster, because it would get dirty.

> I had a situation in Birmingham that required me to explain to Mr. Stimart the
> reason for a derailment.  He told me I had no idea what I was talking about, then I
> listened as Mr. Jim Watts explain [sic] the situation in the same manner that I had
> and it was accepted.

(7/9/01 Wyant Aff. at 4; Doc. 35 at 10).  The defendants assert that the paragraphs should both be

struck because they "bear[ ] no relationship to the controversy."  (Doc. 35 at 10).  The court

agrees because the incidents are undated, involved another city and Stimart played no part in the

decision making process in the present instance.  Without more, the court must strike this

evidence on relevance grounds.

### 10.  Paragraph 29

Paragraph 29 provides:

> Ms. Phyllis Thompson shared with me some figures that Ms [sic] Susan
> Hutchinson from Human Resources had given to her at a meeting, that the total
> BNSF population was about 40,000 people.  In that total population there was
> about 11% females with about 3% holding middle positions end [sic] upper
> management positions are filled with only about 1% female.

(7/9/01 Wyant Aff. at 4; Doc. 35 at 10).  The defendants assert that the entire paragraph is

hearsay.  (Doc. 35 at 10).  This evidence is clearly hearsay and does not meet any exception that

would allow the court to consider the same in this form.

### 11. Paragraph 30

Paragraph 30 provides:

> Women have been tolerated in the clerical and dispatching fields after 30 years of
> continual pushing, fighting, clawing, and persistence; but their presence in the
> field operations and upper management are not welcome and discouraged as
> evidenced by the numbers.

(7/9/01 Wyant Aff. at 4; Doc. 35 at 11).  The defendants object to the same, stating that it is

improperly based on Wyant's belief.  (Doc. 35 at 11).  The defendants are correct.  The statement

is an improper conclusion and due to be struck.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the declarations, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden

to show the district court, by reference to materials on file, that there are no genuine issues of

material fact that should be decided by trial.  Only when that burden has been met does the

burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact

that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.

1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L. Ed. 2d 142

18

(1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judges's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

## IV. DISCUSSION

### A. Wyant's Claim of Disparate Treatment Under Title VII

#### 1. The Termination Claim

The plaintiff first asserts that her termination was a consequence of disparate treatment premised on her gender. (Doc. 1 at ¶ 30). She alleges that she was subjected to disparate

treatment because, unlike other male employees, she did not retain her supervisory position and was placed on a five-year ban from seeking a supervisory position with the defendant subsequent to the investigation of a sexual harassment complaint lodged against her.

The primary issue in a gender based disparate treatment claim is whether the employer intentionally discriminated against the employee because of her gender. *See U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983). Discriminatory intent can be established through either direct or circumstantial evidence. *See id.* at 714 n. 3, 103 S. Ct. 1478.

### a. Direct Evidence of Discrimination:

Wyant asserts that BNSF's "handling of complaints" is direct evidence of discrimination. (Doc. 32 at 5). For discrimination cases, "the distinction between direct and circumstantial evidence is important to preserve." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 (11th Cir. 1998). Direct evidence is "evidence, which if believed, proves existence of fact in issue without inference or presumption." *Id.*; *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir. 1987) (citing Black's Law Dictionary 413 (5th ed. 1979)). In discussing direct evidence, the Eleventh Circuit Court of Appeals has stated as follows:

> . . . . We have defined direct evidence of discrimination as evidence which reflects "'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641 (11th Cir. 1998) (quoting *Caban-Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir. 1990)). In other words, the evidence must indicate that the complained-of employment decision was *motivated* by the decision-maker's [rac]ism. As a result, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age" will constitute direct evidence of discrimination. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081-82 (11th Cir. 1990) (citations and quotations omitted); *see also City of Miami,* 870 F.2d at 582. An example of "direct evidence would

be a management memorandum saying, 'Fire Earley–he is too old.'" *Earley,* 907
F.2d at 1082. . . .

*Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1358-59 (11th Cir. 1999), *cert.*

*denied,* 529 U.S. 1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000). The court has further

explained the impact that direct evidence has on an employment discrimination case. The court

stated:

> "When there is direct evidence that discrimination was a motivating factor in the
> challenged employment decision, the appropriate analysis is different from that
> employed in a case where only circumstantial evidence is available." *Trotter v.*
> *Board of Trustees of University of Alabama,* 91 F.3d 1449, 1453 (11th Cir. 1996);
> *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1556 (11th Cir.), *cert. denied,*
> 467 U.S. 1204, 104 S. Ct. 2385, 81 L. Ed. 2d 344 (1984). The basis for the
> analysis is that once a plaintiff produces direct evidence of a discriminatory
> motive, and the trier of facts accepts this testimony "the ultimate issue of
> discrimination is proved." *Bell,* 715 F.2d at 1556. As such, "the defendant may
> avoid a finding of liability only by proving by a preponderance of the evidence
> that it would have made the same decision even if it had not taken the [illegitimate
> criterion] into account." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.
> Ct. 1775, 1795, 104 L. Ed. 2d 268 (1989).

*Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 961-62 (11th Cir. 1997). *See also Bass v.*

*Board of County Commissioners,* 256 F.3d 1095, 1105 (11th Cir. 2001) (quoting *Early v.*

*Champion Int'l. Corp.,* 907 F.2d 1077, 1081 (11th Cir. 1990)). "Remarks . . . unrelated to the

decision-making process itself are not direct evidence of discrimination." *Standard v. A.B.E.L.*

*Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998).

    In support of her claim of direct evidence, Wyant points to another sexual harassment

complaint lodged by a female subordinate against a male supervisor. In that case, which

occurred in Cicero, Illinois, a Senior Special Agent, Gary Lange,[16] was accused by the female

---

[16] Lange's name is also spelt "Lang" in various places in the record. The correct spelling appears to be Lange and will
be used herein for consistency.

21

victim, Patrol Person Stephanie Podrovitz, of "physical sexual harassment, including unwelcome touching and grabbing and requests for sexual favors." (Doc. 33, Ex. K at 2). As a result of the internal investigation, including Lange's admission that he made certain comments and may have touched her arm or shoulder,[17] the defendant found that "the sexual remarks made by [him] were offensive and in violation of BNSF Company EEO Policy and Rules." (*Id.* at 1). He was required to undergo an Employee Assistance Program Evaluation, attend and successfully compete EEO/Sensitivity training, and to make a 30 minute presentation on the subject of the training. (*Id.*). He was not disciplined in rank, salary or benefits. Wyant argues that although Pate was unable to articulate any positive or negative impact on his work environment stemming from Wyant's alleged sexual harassment, her discipline was much more harsh than the discipline visited upon the male supervisor. She submits that this is direct evidence of discrimination. (Doc. 32 at 6).

The plaintiff's argument is flawed. Whether or not a victim is able to articulate the impact of alleged sexual harassment is but one factor considered in an investigation. The record demonstrates that the decision made by BNSF Human Resources personnel regarding the form of discipline an employee of BNSF should receive when the company's sexual harassment policy is violated is based on conduct that the company could confirm. The plaintiff's assertion that this constitutes direct evidence ignores the inferences that would have to be made by the court to prove the existence of discrimination.

Direct evidence refers to proof of the existence of certain facts that demonstrate a discriminatory motive. In this context, it does not mean evidence given by a victim of sexual

---

[17] He denied her claim that he put his hand between her legs. (Doc. 33, Ex. K).

harassment as to the egregiousness of the conduct he or she has endured, nor does direct evidence refer to evidence of how much one can articulate the positive or negative impact of such conduct. The evidence submitted by Wyant would require the court to infer that the different outcome of each sexual harassment case was based on some discriminatory motive by the company; for example, that the decision makers at BNSF, summarily disregard witnesses' statements that would substantiate a female employee's complaints of sexual harassment, but zealously pursue any evidence given by witnesses to substantiate or corroborate a male employee's allegations of sexual harassment lodged against a female. Thus, it cannot be said that this evidence "proves the existence of fact in issue without inference or presumption." *Rollins*, 833 F.2d at 1528.

Wyant also states, under the heading of direct evidence, that "[t]he standard for males accused of harassment [ ] is to move them away from the problem either in a lateral move or promoted (sic) to another location." (Doc. 32 at 7). In support of this assertion, she states that "Hartzler told [her] that when Mr. Mark Whitley, trainmaster at Armory, MS was accused of racial statements and then later accused of sexual harassment from a contract driver, that it was imperative to get him away from Cathy McGee so he was moved to Temple, TX, his home town, as a trainmaster." (*Id.*). She also states, "Three men were dismissed from their positions in Memphis for various reasons. All three men, Mr. Steve Schultz, Mr. Guy Pollard, and Mr. Chris Curbow, told Wyant they did not have a five year ban placed against them for holding another exempt position and in fact Pollard and Curbow both held exempt positions shortly after their dismissal." (*Id.*).[18] As in the first example (Lange), the plaintiff has misconstrued what

---

[18] Wyant's brief on this point directs the reader to "Exhibit R, page 5." (Doc. 32 at 7). The court has examined the entire affidavit and fails to find this evidence therein. Additionally, even if it were therein, the court is not satisfied it constitutes evidence the court may consider on summary judgment. It appears to be hearsay. Still further, no details have been provided for comparison purposes.

constitutes direct evidence. These examples are not direct evidence.

The plaintiff next claims under the heading of direct evidence that she has demonstrated a prima facie showing of harassment based on the way that BNSF handled the complaints. (Doc. 32 at 7). She states that BNSF's failure to discipline Pate for not reporting the alleged incidents of harassment when BNSF's policy is clear[19] that the same must be reported and the fact that she was terminated, shows direct evidence of disparate treatment. (*Id.* at 7-8). The defendant's handling of the two employees is not direct evidence as defined by binding precedent. Wyant further argues that Pate's failure to object to Wyant's conduct made it "absolutely impossible for her to know that she should not treat Pate the same as her male counterparts. Wyant was terminated for her alleged violation." (Doc. 32 at 8). This is not direct evidence.

The plaintiff's next purported reference to direct proof of discrimination is the altercation between herself and Pate on June 23, 1999, when Pate entered her office, leaned over her desk and yelled at her over an incident that happened earlier in the day. (7/9/01 Wyant Aff. at 1). Wyant was intimidated because of Pate's size and his yelling at her. (*Id.*). Pate was waving his arms and "yelled about how unsafe it was to ride a cut of cars 4000 feet to a joint." (Doc. 32 at 8). Pate became louder and more excited as Wyant talked with him. Wyant felt nervous and threatened by his actions and size. (*Id.* at 9; 7/9/01 Wyant Aff. at 1). Wyant reported this to terminal manager Hartzler. Pate was then required to write a letter of apology to Wyant. Wyant alleges that BNSF's tolerance of this and other acts of insubordination is a direct showing of disparate treatment. (Doc. 32 at 8). The court once again degrees; this is not direct evidence.

---

[19] The defendant's Workplace Harassment Policy does require any employee who believes that he or she has been harassed "to report or complain about the situation as soon as possible." (Doc. 33, Ex. J). The defendant's Safety Rules and General Responsibilities for All Employees also states, "Employees who feel they have been sexually harassed must contact their manager, local Employee Relations, or Corporate Employee Relations." (*Id.* at Ex. M).

24

**b. Circumstantial Evidence**

The appropriate framework from which to evaluate the plaintiff's claim of disparate treatment when circumstantial evidence is involved is under the familiar burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  Under this framework, the Title VII plaintiff has the initial burden of establishing a prima facie case of discrimination.  *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

In *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999), the Eleventh Circuit Court of Appeals stated that, "[t]o establish a prima facie case of disparate treatment, Appellant must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job.  If a prima facie case is shown, the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824.  If this is done, the plaintiff is required to show that the proffered reason was merely a pretext for the defendant's acts.  *See Burdine*, 450 U.S. at 253.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff." *Id.*

The parties do not dispute that the plaintiff is a member of a protected group, that she was subject to an adverse job action, or that she was qualified for the position.  They do dispute the reason for her termination from a supervisory position.  As previously stated, the plaintiff was terminated, then allowed to take a non-supervisory position in Texas based on her seniority.

Wyant asserts that the reason for the termination was her sex and the defendant asserts that it was her violation of the company's sexual harassment policy.

To show her prima facie case, Wyant asserts that similarly situated persons not in her protected class received dissimilar treatment. *See Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989). To meet this burden, she must show that she and the non-protected person or persons "are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). As noted in *Jones v. Bessemer Carraway Medical Center*, "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." 137 F.3d 1306, 1311 (11th Cir.), *superseded in part on other grounds*, 151 F.3d 1321 (11th Cir. 1998). The defendant asserts that the plaintiff's disparate treatment claim is insufficient because she cannot show that a similarly situated person was treated differently. (Doc. 26 at 7).

As explained in *Maniccia*, 171 F.3d at 1368-69, the Eleventh Circuit stated:

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), opinion modified by 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (Internal quotations and citations omitted). We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the case must be fair congeners. In other words, apples should be compared to apples.").

*Maniccia*, 171 F.3d at 1368-69. Thus, in a case such as the present one that involves employee

discipline, the issue is whether the other employees are "similarly situated" for comparative purposes. This will be the situation only if their conduct is "nearly identical" in relevant respects to that of the plaintiff. The burden is on the plaintiff to show that similarly situated employees were not treated equally. *See Jones*, 874 F.2d at 1541. In making this determination, "the court must consider whether the employees involved in or accused of the same or similar conduct were disciplined in different ways." *Gaston v. Home Depot USA, Inc.*, 129 F. Supp. 2d 1355, 1269 (S.D. Fla.), *aff'd*, 265 F.3d 1066 (11th Cir. 2001) (Table). "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed." *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir.) (quoting *Holifield*, 115 F.3d at 1562), *cert. denied*, ___ U.S. ___, 122 S. Ct. 402, 151 L. Ed. 2d 305 (2001).

The defendants also cite to *Radue v. Kimberly Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000), which was a reduction in force case, for the proposition that "[t]he failure to show a common supervisor 'alone probably precludes a showing of similarity because "when different decision makers are involved, two decisions are rarely similarly situated in all relevant aspects.""" (Doc. 26 at 8, citing *Radue*, 291 F.3d at 618 (quoting *Stanback v. Best Diversified Products, Inc.*, 180 F.3d 903, 910 (8th Cir. 1999). In *Jones*, 874 F.2d at 1541-42, an African-American police officer brought an action claiming that he was treated differently than other officers when he was disciplined for the unauthorized use of a police vehicle (a truck) and related violations. Jones alleged that other officers and another supervising sergeant also used the truck in unauthorized ways. The court stated that these other incidents were inapposite "absent any evidence that [the disciplining Chief of Police] and Sergeant . . . **knew** of such transgressions."

27

*Jones*, 874 F.2d at 1541 (emphasis added).  The court further stated, "For the purposes of this

Title VII action, [the other sergeant's] previous tolerance of Unit truck use for personal business

would be relevant only if it could be shown that either [of the officers imposing the discipline in

the plaintiff's case] **knew** of such practices **and did not act** to discipline rule violators." *Jones*,

874 F.2d at 1542 (footnote omitted) (emphasis added).   In *Anderson v. WBMG-42*, 253 F.3d

561, 565-66 (11ᵗʰ Cir. 2001), the court, in response to a defendant's argument that a plaintiff

cannot prevail as a matter of law whenever two different supervisors are involved in disciplining

the plaintiff and comparators, stated in dicta:

> We . . . reject [the defendant's] position that *Jones v. Gerwens*, 874 F.2d 1534,
> 1541 (11ᵗʰ Cir. 1989) and *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306,
> 1311 (11ᵗʰ Cir. 1998), *opinion modified by* 15 F.3d 1321 (1998), stand for the
> proposition that whenever two different supervisors are involved in administering
> the disciplinary actions, the comparators cannot as a matter of law be similarly
> situated for Title VII purposes.
>
> . . .
>
> Neither of these cases, however, support a broad assertion. *Bessemer* specifically
> indicated evidence of different supervisors' involvement in the disciplinary
> process is not determinative of the question.  137 F.3d at 1312 n.7 ("Different
> supervisors may have different management styles that – *while not determinative*
> – *could* account for the disparate treatment that employees experience.")
> (emphasis added).  In *Gerwens*, we said that, under the circumstances there,
> different supervisors "*may* not be comparable" for the purposes of Title VII
> analysis.  874 F.2d at 1541 (emphasis added).

253 F.3d at 565-66.  Accordingly, the fact that different supervisors are involved does not alone

prevent a person from being a similarly situated employee.

The plaintiff identifies several individuals whom she believes engaged in misconduct

similar to hers, but received less severe punishments.  Initially, she points to a male supervisor

(Lange) who had a sexual harassment charge lodged against him by a female subordinate

(Podrovitz). As already discussed, in that situation, Podrovitz accused Lange of making inappropriate remarks and placing his hand between her legs, moving it up her thigh, pulling her towards him, and draping his hands over her back at chest level. (Doc. 33, Ex. K). McGee was one of the persons involved in the decision to discipline Lange.

Lange is not an appropriate comparator due to the clear difference in the quality and quantity of the evidence in the two instances. *See Leiting v. Goodyear* 117 F. Supp. 2d 950 (D. Neb. 2000) (noting "[o]ne obvious distinguishing circumstance is that Brown had a witness to the [ ] incident, whereas Goodyear's investigations into [the plaintiff's] various complaints did not yield any corroborative evidence"). In Lange's situation, he denied any inappropriate physical contact and there were no independent witnesses to corroborate the victim's allegations. The situation involving improper physical contact was a swearing match between Lange and Podrovitz. Accordingly, Lange was disciplined only for the improper comments.[20] In Wyant's situation, the misconduct that involved physical touching was supported by corroborating witnesses. Nelson stated that he saw Wyant run her fingers through Pate's hair, Mathews saw her rub Pate's shoulder and chest, Maddox saw her rub his shoulders and back and he saw her chest touching his back, Campbell and Buzbee saw her rubbing Pate's shoulders, Miller saw her hand on Pate's shoulder, and Woods saw her rubbing Pate's back and hair. The discipline visited upon the male supervisor (Lange) was in proportion to what could be proven. In both instances, McGee's decision was based on what the company could confirm.

Wyant also states that Mike Wacker and Mark Whitley are also comparators. Wyant was

---

[20] The court notes that the purported comments by Lange were significant; however, there is a significant difference when the improper conduct involves physical contact as opposed to verbal comments.

told by another employee, Valerie Carr, that Trainmaster Wacker had been "slapping her on the buttocks, and she finally complained to local management." (7/9/01 Wyant Aff. at 4). Carr told her that she was interviewed by a Mr. Wisman and Mr. Rick Pennington, who found it hard to believe that Wacker would do something like that. (*Id.*). They intimidated Carr from complaining to Human Resources. Wacker was only required to write a letter of apology and was later promoted two times. (*Id.*). Although the court has already determined that this evidence is due to be excluded, the court further finds that, even if appropriate for consideration, it would not be adequate comparator evidence. There is no commonality of decision makers or knowledge of or involvement in the Wacker matter on the part of McGee as far as this court can discern from the record.

In her brief in response to the motion for summary judgment, Wyant also states that Hartzler told her that when Whitley, who was the trainmaster at Amory, Mississippi, was "accused of racial statements and then later accused of sexual harassment from a contract driver," he was moved to his hometown in Temple, Texas, because "it was imperative to get him away from Cathy McGee." (Doc. 32 at 7). There is no citation in the brief to this evidence in the record and the court has been unable to locate the same in the submitted exhibits. Accordingly, it may not be considered on the motion. Assuming that Hartzler made such a statement, it is insufficient for this court to find that Whitley is a proper comparator. There is no indication of the details of the allegations or the quality and quantity of the evidence against him.[21]

Wyant also claims that Steve Schultz, Guy Pollard and Chris Curbow were dismissed from their positions in Memphis for various reasons, but were not terminated from holding an

---

[21] There is no evidence that McGee was ultimately involved in this matter or that she had any knowledge of the same.

exempt position. (Doc. 32 at 7). Once again, there is no citation in the brief to this evidence and the court has been unable to locate any reference to the same in the record. Therefore, it may not be considered. Assuming, again for the sake of argument, that this information is true, it is insufficient to demonstrate that these three individuals are similarly situated to the plaintiff. There is no allegation, much less evidence, that they were involved in sexual harassment that included physical contact.

In McGee's affidavit, she stated that she has "encountered only one comparable situation, which involved a male supervisor who improperly touched female employees. Evidence in the matter also supported the allegations. The individual was terminated from the company." (McGee Aff. at 4). Although it is not the defendants' responsibility to produce comparator evidence, this assertion is not adequately disputed by the plaintiff herein.

The plaintiff contends in sum that her allegations and evidence are sufficient to state a prima facie case. For the reasons discussed herein, the court finds that plaintiff has failed to establish a prima facie case of disparate treatment.[22]

To the extent that Wyant asserts that she is similarly situated with Pate, the court finds otherwise. Wyant argues that BNSF did not discipline Pate after Wyant ordered a formal investigation stemming from Pate's insubordination. In addition, Wyant points out that Pate was

---

[22] Wyant denies any inappropriate touching and "resents [Pate] saying that [she] did" touch him on his chest, hair, or thigh. (10/29/99 Wyant Aff. at 1). Wyant claims that she never knew or believed that any of her conduct was inappropriate and she never intended it to be perceived as such. She also claims that defendant, at no time, presented any evidence that "might suggest that any alleged behavior on the part of the plaintiff had any . . . impact on [Pate's] employment with BNSF, and that [Pate] was neither threatened nor promised anything with regard to his dealings with the plaintiff." (Complaint ¶ 33). However, it is important to reiterate at this juncture that Wyant "is alleging a claim of sex discrimination, not defending [herself] against a claim of sexual harassment. The question is not, therefore, whether [Wyant] in fact sexually harassed [Pate]." *Raleigh v. Snowbird Corp.*, 992 F. Supp. 1295, 1297 (D. Utah 1998), *aff'd*, 172 F.3d 63 (10th Cir. 1999). The question is whether the defendant responded "to a complaint of sexual harassment against [Wyant] differently than [the defendant] responded to a complaint of sexual harassment lodged against any [male] employee, and, if [the defendant] did respond differently, whether it did so because of [Wyant's] sex. *Id.*

not disciplined for failing to report sexual harassment "immediately" as required under BNSF's sexual harassment policy.

Pate is not a proper comparator for several reasons. First, Wyant was a Trainmaster, which is a supervisory position. Pate is a foreman – a non-supervisory position. Consequently, Wyant and Pate are not similarly situated with respect to the relevant aspects of their employment for purposes of disciplining procedures. Furthermore, Pate's alleged insubordination and his failure to report sexual harassment sooner are not similar to Wyant's alleged misconduct – engaging in sexual harassment that involves physical touching. In *Jones,* the court stated that, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways" when determining whether employees are similarly situated. *Jones*, 137 F.3d at 1311. Pate's alleged insubordination towards Wyant and his failure to report sexual harassment (immediately) as called for in BNSF's policy are not the "same or similar conduct" as actually engaging in sexual harassment. *Id.*

The manner in which BNSF handled Wyant's complaint of Pate's insubordination differed from the manner the company handled Pate's complaint of sexual harassment lodged against Wyant. The plaintiff argues that by Hartzler handling Wyant's complaint of insubordination on his own, yet referring Pate's complaint of sexual harassment to Human Resources for investigation, instead of handling it himself, this is evidence of disparate treatment. The defendant argues that the two complaints were handled differently because Pate is a union employee who was subject to a collective bargaining agreement. (Doc. 34 at 5). Wyant's complaint against Pate had to be handled pursuant to that agreement. (*Id.*). Pate's complaint against Wyant, however, did not have to be handled on a local level because Wyant, holding the

supervisory position of Trainmaster, was not a union employee.  The defendant also notes that "Pate's complaint regarding Wyant's bug comments was initially handled by Hartzler himself, but BNSF's human resources department became involved after it was clear that Hartzler's attempt to address the complaint had failed."  (Doc. 34 at 6, note 7 citing Ex. U (Hartzler Depo.), p. 58).  This evidence is not comparator evidence.  At best, it is to be considered on the issue of pretext if a prima facie case is demonstrated.

> c. **Whether plaintiff has demonstrated that BNSF's proffered legitimate, nondiscriminatory reason for terminating plaintiff from her supervisory position was pretextual**

Assuming for the sake of argument that Wyant has established a prima facie case of discrimination, the defendant "must articulate some legitimate, nondiscriminatory reason" for the challenged employment action.  *McDonnell Douglas*, 411 U.S. at 802.  The defendant's reason for terminating the plaintiff was articulated by McGee.  She states:

> In his statement, Pate claimed a three-year pattern of sexual harassment by Wyant. (Ex. A).  The witness statements corroborated Pate's allegations. . . .
>
> . . . .
>
> On three occasions, Suitte interviewed Wyant and took her sworn statements.  Wyant denied Pate's allegations. (Ex. I).  Suitte submitted Wyant's sworn statements, as well as those of Pate and the witnesses to me . . .
>
> [My] decision to terminate Wyant was based upon her history/pattern of inappropriate behavior, which was confirmed by both Pate and independent witnesses. . . .  In light of [BNSF's sexual harassment policy] and the numerous witnesses who corroborated Pate's allegations, I honestly and in good faith believed the investigation established that Wyant was guilty of violating BNSF sexual harassment policies.

(McGee Aff., pp. 2-3 at ¶¶ 4-8).

Since the defendant has articulated its reason, Wyant must show that the articulated

33

reason was a mere pretext for intentional discrimination. *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Wyant is able to do this either by showing that the defendants' proffered reason is unworthy of credence or by showing that gender more likely motivated the employment action. *See Elrod v. Sears, Roebuck & Co.*, 939 F. 2d 1466, 1470 (11th Cir. 1991).

The plaintiff offers various assertions to demonstrate pretext. (Doc. 32 at 10-11). In her brief, she states (1) that she was told by an unspecified BNSF supervisor in 1996 "that the company was attempting to get rid of her" and that "he believed Wyant would be 'better in an office environment, an administrative job;'" (2) that when she originally applied to be a Yardmaster a supervisor laughed and the jobs were given to men; (3) Pate did not like reporting to a female supervisor and he is glad that she is gone; (4) when Pate complained, she was told by a supervisor that he did not "want to be the 'grim reaper, but [Wyant] may not have a job after the investigation is complete; (5) that when a man is slapped on the back it was tolerated, but when she did the same thing it was sexual harassment; and, (6) that BNSF nor Pate were able to find one witness that would state that her conduct towards Pate was sexually harassing in nature. (Doc. 32 at 11).

In discussing the burden that must be met by the plaintiff to show pretext, the Eleventh Circuit stated as follows:

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," *Cooper-Houston v.*

34

> *Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994) (citation omitted).  The
> district court must evaluate whether the plaintiff has demonstrated "such
> weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in
> the employer's proffered legitimate reasons for its action that a reasonable
> factfinder could find them unworthy of credence." *Sheridan*, 100 F.3d [1061,]
> 1072 [*cert denied*, 521 U.S. 1129, 117 S.Ct. 2532, 138 L. Ed. 2d 1031 (1997),]
> (citation and internal quotation marks omitted); *see also Walker*, 53 F.3d [1548,]
> 1564 [(1995)] (Johnson, J., concurring) (discussing methods of proving pretext).
> However, once the district court determines that a reasonable jury could conclude
> that the employer's proffered reasons were not the real reason for its decision, the
> court may not preempt the jury's role of determining whether to draw an inference
> of intentional discrimination from the plaintiff's prima facie case taken together
> with rejection of the employer's explanations for its action. At that point,
> judgment as a matter of law is unavailable.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045,

118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).  Reviewing the plaintiff's articulated arguments and

evidence, the court finds that she has not satisfied *Combs*.

The plaintiff's first two assertions, regarding events in 1996, are insufficient for a number

of reasons.  First, this matter concerns her termination not her promotion.  Second, she was made

a supervisor.  Third, these comments were not made by the decision maker in this case.  Fourth,

there is no indication that any supervisor making those statements was involved in her

termination.

The plaintiff's third assertion, regarding Pate's attitude towards her and women in

general, is insufficient.  Pate was not the decision maker.  His personal opinions are not relevant.

In this situation, Pate's comments are not pertinent to McGee's decision to discipline Wyant.

Furthermore, there is no evidence suggesting that Pate made these statements before Wyant was

terminated from her exempt position.  Any comment made by Pate that he is glad she is gone

would have been subsequent to McGee's decision to discipline Wyant for violating the

35

company's sexual harassment policy. There is no connection between Pate's alleged statements and McGee's decision as to what form of discipline Wyant should receive.

The plaintiff's fourth assertion, that Suitte commented, "'not to be the grim reaper, but you may not have a job after the investigation is complete,'" shows pretext, is not sufficient.[23] (7/9/01 Wyant Aff. at 3). This statement was made after Wyant had been interviewed twice, Pate had been interviewed and the witnesses had provided statements. Her assessment of the situation which was conveyed to Wyant during a conversation with Suitte and Hartzler when they were discussing the results of the investigation does not show pretext.[24]

The plaintiff's fifth assertion, regarding the different handling of situations involving men slapping each other on the back and her situation, is not impressive. First, this assessment is totally inapposite to the present situation. This case is not about a slap on the back. It is premised on the more discrete circumstances involving Wyant rubbing Pate's shoulders, "run[ning] her fingers through [his] hair," and placing her hand on his thigh. (Pate Aff. at 1). These allegations are much more than a slap on the back.

The plaintiff's last assertion, that there were no witnesses that could state that her conduct towards Pate was sexually harassing in nature, is simply wrong. The record is replete with other witnesses who saw her touching Pate. Pate asserted in his affidavit and at his deposition that the touching was "sexually harassing" and he was embarrassed. (Pate Aff. at 1). Additionally, McGee concluded that the evidence from the interviews was in violation of the defendant's sexual harassment policy, which prohibits "sexual flirtations, touching, advances, or

---

[23] Although the court has struck this statement, it will be considered only for the purpose of completeness.

[24] Suitte told Wyant that the interviews of the witnesses were "mixed and not that conclusive." (7/9/01 Wyant Aff. at 3).

36

propositions." (McGee Aff. at 3). McGee correctly observed that the witnesses "corroborated Pate's allegations." (*Id.*).

In *Elrod*, the court stated that "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. The inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod*, 939 F. 2d at 1470. The plaintiff has not satisfied her burden of proving that her termination, stemming from an alleged violation of the company's sexual harassment policy was a mere pretext for discrimination, and, as such, the plaintiff has failed to establish a prima facie case of discrimination. Therefore, the defendants' motion for summary judgment is due to be granted on this claim.

The plaintiff appears to also challenge the decision premised on the defendants' actions involving the misconduct of Lange, Wacker, Whitley, Schultz, Pollard, Curbow and Pate. The sum and substance of her retort is that the evidence shows that males were treated differently than she was. The court has previously examined these matters and finds that they do not overcome the defendants' motion for summary judgment.

## B. Equal Pay Act

Wyant began working for BNSF in 1970 and was promoted on August 16, 1995, from dispatcher to trainmaster. (Doc. 32 at 9). Her initial salary as a trainmaster was approximately $4,620.00 per month. In 1997, her monthly salary was $4,926.00 per month. (*Id.*). Tommie Alfano ("Alfano") began working for the railroad in 1967 and was a trainman until 1979 when he became a yardmaster. (*Id.*). In 1997, Alfano was promoted to Trainmaster with a starting salary of approximately $5,000.00 per month. She claims this difference is proof of discrimination. (*Id.*). Wyant also appears to be asserting that in 1999, while she was employed as a trainmaster,

37

her annual base salary was less than the annual base salary of Alfano, a male trainmaster. (Wyant Depo. at 61, 65). She alleges that the disparity in pay was because of her gender. (Complaint at ¶ 37). The defendants assert that the pay disparity was due to Alfono's superior experience and prior salary history.

Wyant worked principally as a clerk from 1970 until 1986, when she was promoted to a dispatcher.[25] (Wyant Depo. at 33-34). She stayed in that position until she was made a trainmaster in 1995. (*Id.*). In contrast, Alfano had approximately 20 years experience as a yardmaster. (McGee Aff. at ¶ 10). He also had an additional two years experience as a trainmaster in an unofficial capacity. (*Id.*). His pay the two years before he was promoted to a salaried trainmaster position was $90,000.00, due to overtime compensation as an hourly employee.

The considerations in evaluating a claim of gender-based wage discrimination are the same as any disparate treatment case under *McDonnell Douglas*. *Meeks v. Computer Associates Intern.*, 15 F.3d 1013, 1018-19 (11th Cir. 1994). Assuming that the plaintiff has demonstrated a *prima facie* case, the defendant has stated its reasons for the differences in pay. The plaintiff has not offered any argument, much less evidence to show pretext. There is no evidence of intentional discrimination in pay to overcome the defendant's motion for summary judgment.[26]

To the extent that the plaintiff's pay claim may fall under the EPA,[27] the court finds the

---

[25] It appears from the record that at some point in the late seventies, she also worked for a period as a yardmaster. (Wyant Depo. at 33-34).

[26] To the extent that the plaintiff offers the arguments of pretext from the last section in support of her claim, the court finds them insufficient for the reasons stated previously.

[27] The only reference to the EPA is in paragraph 24 of the complaint.

motion for summary judgment is due to be granted. A prima facie case of an EPA violation is

shown if the employer "pays different wages to employees of opposite sexes 'for equal work on

jobs . . . [requiring] equal skill, effort, and responsibility, and which are performed under similar

working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S. Ct. 2223,

2228, 41 L. Ed. 2d 1 (1974) (quoting 29 U.S.C. § 206(d)(1)); *Mitchell v. Jefferson County Bd. of

Educ.*, 936 F.2d 539, 547 (11th Cir. 1991). Once a prima facie case is demonstrated, to avoid

liability the employer must show that the differential is justified by one of four exceptions set

forth in the EPA. *Corning Glass Works*, 417 U.S. at 196-97, 94 S. Ct. at 2229; *Irby v. Bittick*, 44

F.3d 949, 954 (11th Cir. 1995). Those exceptions are: "(i) a seniority system; (ii) a merit system;

(iii) a system which measures earnings by quantity or quality of production; or (iv) a differential

based on any factor other than sex." 29 U.S.C. § 206(d)(1). The employer bears the burden of

proof for these affirmative defenses. *Corning Glass Works*, 417 U.S. at 196-97, 94 S. Ct. at

2229; *Price v. Lockheed Space Operations Co.*, 856 F.2d 1503, 1505 (11th Cir. 1988); *Meeks*, 15

F.3d at 1018. The defendant "must show that the factor of sex provided no basis for the wage

differential." *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 590 (11th Cir.), *cert. denied*, 513

U.S. 919 (1994). If the defendant shows the same, then the plaintiff must rebut the explanation

by "showing with affirmative evidence that it is pretextual or offered as a post-event justification

for a gender based differential." *Irby*, 44 F.3d at 954 (citing *Schwartz v. Florida Bd. of Regents*,

954 F. 2d 620, 623 (11th Cir. 1991) (per curiam); *see Hodgson v. Behrens Drug Co.*, 475 F.2d

1041, 1045 (5th Cir. 1973) (quoting *Shultz v. First Victoria Nat'l Bank*, 420 F.2d 648, 655 (5th

Cir. 1969)). If the plaintiff "is able to create the inference of pretext, there is an issue which

should be reserved for trial." *Irby*, 44 F. 3d at 954.

There is no dispute that the plaintiff was paid less than Alfano for performing the same work involving equal skill, effort, responsibility, and working conditions. The plaintiff asserts that the difference in pay was because of her gender. (Doc. 26 at 9). On the other hand, the defendant asserts that the pay disparity was due to Alfano's superior experience and prior salary history. (Doc. 26 at 13-17). The defendant supports its position with the affidavit of Cathy McGee. She states:

> Alfano had approximately 20 years experience as a Yardmaster in Birmingham. In deciding Alfano's salary as a Birmingham Trainmaster, BNSF would have considered his previous experience as a Birmingham Yardmaster, which is very transferable to the Birmingham Trainmaster position. (A Dispatcher position is not similarly transferable to Trainmaster.) Moreover, Alfano had worked as a "bootleg" Trainmaster for over a two year period prior to becoming a full-time Trainmaster. As a "bootleg" Trainmaster, Alfano performed the work of a Trainmaster, although BNSF had not officially hired him for the position. As a "bootleg" Trainmaster, Alfano received his Yardmaster hourly rate, but was entitled to overtime (since Yardmaster is not a salaried position). Alfano had made over $90,000 in the two years prior to his hiring as a salaried Trainmaster because of the substantial amount of overtime hours he worked as a "bootleg" Trainmaster.

> Further, the Trainmaster pay scale Wyant was hired under (placing starting Trainmasters at a salary of $4,500 to $5,000 per month) was instituted after Wyant was promoted to Trainmaster but before Alfano's promotion. The pay scale resulted from the merger of Burlington Northern and The Atchison, Topeka and Santa Fe Railroad, which created BNSF.

> In short, Alfano's superior work experience and substantial earnings in the prior years justified his initial salary of $5000 per month.

> Wyant's initial Trainmaster salary of $4,620 per month in 1995 was justified in light of her lesser experience and lower previous salary. Although Wyant had worked as a Yardmaster in St. Louis, she had worked primarily as a Dispatcher in the nine to ten years prior to her hiring as a Trainmaster. During the year before her promotion to Trainmaster, Wyant made approximately $53,000 as a Dispatcher, much less than Alfano's earnings before his promotion. Alfano's prior work experience, prior wage history, and the salary structure in place at the time of his hiring were the basis for any difference in starting pay between Alfano

and Wyant . . . BNSF never considered gender in deciding the salaries of Wyant and Alfanao.

(McGee Aff. at 4-5).

BNSF's reference to Alfano's prior salary in setting the current salary alone is not a legitimate factor other than sex. In *Irby*, the district court explained that "[i]f prior salary alone were a justification, the exception would swallow up the rule and inequality in pay among genders would be perpetuated." *Irby v. Bittick*, 830 F. Supp. 632, 636 (M.D. Ga. 1993). Courts have consistently held that "prior salary alone cannot justify pay disparity" under the EPA. *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 & n. 9 (11th Cir.), *cert. denied*, 488 U.S. 948 (1988); *accord Price*, 856 F.2d at 1506. However, an Equal Pay Act defendant "may successfully raise the affirmative defense of 'any other factor other than sex' if he proves that he relied on prior salary *and* experience in setting a 'new' employee's salary." *Irby*, 44 F.3d at 955 (emphasis in text); *see Glenn*, 841 F.2d at 1571 n. 9.

One of the factors removing a defendant's conduct from the parameters of the EPA is differentiation based on a "factor other than sex." *Irby*, 44 F.3d at 955. The Eleventh Circuit Court of Appeals has stated, "In the past, we have found that such factors include "unique characteristics of the same job; . . . an individual's *experience*, training or ability; or . . . special exigent circumstances connected with the business." *Id.* (emphasis in text) (citing *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir.), *cert denied*, 488 U.S. 948 (1998)). Thus, "[e]xperience is an acceptable factor other than sex if [it is] not used as a pretext for differentiation because of gender." *Irby*, 44 F.3d at 956.

Wyant also supports her disparate pay claim based upon letters dated January 4, 1999,

referencing merit increases given to her and Alfano. (Wyant Depo. at 65-66). Alfano received a 2.27 percent salary increase placing his yearly salary at $63,384. (*Id*. at 65). At the same time, Wyant received a 2.34 percent increase placing her yearly salary at $62,496. (*Id*.).

Before BNSF promoted Wyant to a trainmaster in 1995, Wyant was a dispatcher in Springfield, Missouri for nine years. (Wyant Depo. at 34). Prior to becoming a dispatcher, Wyant was a clerk and yardmaster at BNSF's terminal in St. Louis, Missouri for approximately three years. (*Id*. at 33-34). Before BNSF promoted Alfano to a trainmaster in 1997, Alfano had held the position of yardmaster for approximately twenty years. (McGee Aff. at ¶ 10). Although Wyant's years of experience as a trainmaster exceeds Alfano's experience as Trainmaster by two years, in 1999, Wyant's annual base salary was approximately $900 less than the annual base salary of Alfano. Because the yardmaster is the first-line supervisor over the train crews and train operations in the railroad yard, and the dispatcher controls the movement of trains over a large area, the defendants' explanation that the yardmaster experience is more transferable to trainmaster than a dispatcher's experience is a reasonable explanation for the difference. Accordingly, the defendant has offered an appropriate explanation for the pay differential at issue. McGee's affidavit, explaining the basis for the pay differential, is the kind of specific evidence that removes the defendant from the parameters of the EPA. The plaintiff, therefore, is required to rebut the explanation with some affirmative evidence. Wyant offers nothing specific that overcomes the defendant's motion for summary judgment on this claim. Accordingly, the motion is due to be granted.

As part of her disparate treatment claims, the plaintiff asserts that of the 38,000 people employed by BNSF, 11% are women and 1% of women hold upper management positions with

42

about 3% holding middle management positions as compared to 3% of management being male. (Doc. 32 at 9). The proffered evidence is wholly irrelevant to the plaintiff's claims. The plaintiff alleges that her pay and termination from an exempted position were premised on her gender. These statistics are improper vehicles to prove discrimination in a case alleging disparate treatment (as opposed to a disparate impact case). *See Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 (7th Cir. 1997) (citing *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1253 n. 8 (7th Cir. 1990)). Accordingly, summary judgment is due to be granted the defendant on the plaintiff's disparate treatment claims.

### C. Conspiracy under Section 1985

The plaintiff next alleges that the defendants conspired to remove her from her supervisory position because of her gender. (Doc. 32 at 14). In support of her allegations, she asserts that BNSF's decision "not to investigate the plaintiff's internal complaint and its affirmative neglect of the history of allegations as to improper conduct were carried out with the knowledge of Mr. Pate and Mr. Hartzler and constitutes acts in furtherance of the conspiracy." (Complaint at ¶ 41; Doc. 32 at14). Wyant further alleges that the defendants engaged in a conspiracy "to remove the plaintiff and thus fill the vacancy with a less qualified male applicant, [and] deprive the plaintiff of retirement and employment benefits and pay." (Complaint at ¶ 41, Doc. 32 at 14). To establish a conspiracy, the plaintiff "must allege and prove that the defendant agreed with at least one other conspirator to accomplish an unlawful end and intended to have that unlawful end brought about." *First Bank of Childersburg v. Florey*, 676 So. 2d 324, 327 (Ala. Civ. App. 1996).

The defendants assert that this claim is barred by the intracorporate conspiracy doctrine

and relies on *Dickerson v. Alachua County Commission,* 200 F.3d 761, 765 (11th Cir. 2000).  In

*Dickerson*, the Eleventh Circuit Court of Appeals considered a challenge to § 1985(3) claims

arising out of the same facts that supported the plaintiff's Title VII claim.  *Id.*  The plaintiff, an

African-American who worked for the county as a jail officer, was demoted after an inmate

escaped.  *Id.* at 764.  The plaintiff alleged that the county and its white jail officers and managers

conspired to hold the plaintiff responsible for the escape, even though he was not to blame.  *Id.*

The court rejected the defendant's argument that Title VII preempts a § 1985(3) conspiracy claim

for employment discrimination.  *Id.* at 766.  The court went on to hold, however, that "a

corporation's employees, acting as agents of the corporation, are deemed incapable of conspiring

among themselves or with the corporation."  *Dickerson*, 200 F.3d at 767.

The intracorporate conspiracy doctrine stems from "basic agency principles that 'attribute

the acts of agents of a corporation to the corporation, so that all of their acts are to be those of a

single legal actor.'"  *Dickerson,* 200 F.3d at 767, quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660

F.2d 594, 603 (5th Cir. Nov. 1981).  The reasoning behind the intracorporate conspiracy doctrine

is that it is not possible for a single legal entity consisting of the corporation and its agents to

conspire with itself, just as it is not possible for an individual to conspire with himself.  *Dussouy,*

660 F.2d at 603; *Dickerson*, 200 F.3d at 767.

In order to establish a § 1985(3) conspiracy claim, Wyant must show an agreement

between "two or more persons" to deprive him of his civil rights.  42 U.S.C. § 1985(3).  As noted

above, she alleges that "the decision not to investigate the plaintiff's internal complaint and its

affirmative neglect of the history of allegations as to improper conduct were carried out with the

knowledge of Mr. Pate and Mr. Hartzler constitutes acts in furtherance of the conspiracy . . . [and

44

the] [d]efendants engaged in a conspiracy to remove the plaintiff and thus fill the vacancy with a less qualified male applicant, [and] deprive the plaintiff of retirement and employment benefits and pay." (Doc. 32 at 14).

This court holds that the plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. The court in *Dickerson* made it clear that the county would not be capable of conspiring with itself. *Dickerson* 200 F.3d at 767. Similarly, BNSF and its employees, including Hartzler and Pate, constitute a single legal entity and thus are incapable of conspiring with each other.

### D. Breach of Contract

The plaintiff next alleges that BNSF has represented to employees in various writings such as BNSF's personnel policies, procedure manuals, and retirement and profit sharing plans, that their employment relationship would be based on good faith, that employees would be treated fairly and equitably, that employees would be judged on the basis of individual merit and ability, and that employees would receive just compensation for their services rendered to the defendant. (Complaint ¶ 45, Doc. 32 at 12). The plaintiff asserts that these writings created an employment contract and that the plaintiff has performed all conditions, covenants, promises, duties, and responsibilities required of her to be performed in accordance and in conformity with her employment contract. Therefore, she bases her breach of contract claim on BNSF's wrongful failure to judge her on the basis of merit and ability and wrongful termination of her. (Complaint, ¶¶ 47-48). Consequently, the court must first address whether these writings (the personnel policies and procedure manuals) are sufficient to create a contract of employment; and, if so, whether the defendant breached that contract.

45

The Eleventh Circuit Court of Appeals has stated that an employment relationship is "'permanent,' and thus not terminable 'at will,' if: (1) there was a clear and unequivocal offer of 'permanent' employment, (2) the employee provided some substantial consideration for the contract apart from the services rendered, and (3) the individual making the offer had power to bind the employer." *Green v. City of Hamilton, Housing Authority*, 937 F.2d 1561, 1564 (11th Cir. 1991); *see also Hoffman-LaRoche v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987). The court in *Hoffman-LaRoche*, 512 So. 2d at 734-35, noted the following:

> To become a binding promise, the language used in the handbook must be specific enough to constitute an actual offer rather than a mere statement of general policy. . . . Indeed, if the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so state in the handbook.

The defendants argue that the express disclaimer located on page six of policy number 20.1 ("Human Resources Employment Policy") that Wyant received quickly dispels the notion that any employment contract existed between Wyant and BNSF. ( Doc. 26 at 19). The disclaimer states:

> This policy, as well as all the policies herein, is not intended to imply a contract of employment. Employment can be terminated, with or without cause, and with or without notice, at any time, at the option of either the Company or the employee.

(Doc. 26, Ex. M). Another express disclaimer contained in an employee handbook that Wyant received (Wyant Depo at 42) states the following:

> The plans, policies and procedures set forth in this handbook are not conditions of employment, nor are they intended to be contractual and do not constitute, nor are they part of, any contract of employment or any other kind of contract . . . It should also be understood that only the Chairman and/or Executive Vice President Employee Relations can approve oral and written contracts for Burlington Northern Inc. Employment at BN is employment at will.

46

(Doc. 26, Ex. M. at 3).

The language in the employment policy and the handbook do not constitute an offer of employment. Rather, the language in these writings expressly disclaims that a contract of employment is in any way created. BNSF chose to state clearly and expressly in its handbook that the policies and procedures contained in the handbooks are not "*intended to be contractual and do not constitute, nor are they part of, any contract of employment or any other kind of contract. . . . Employment at BN is at will.*" (*Id.*) (italics added). The employee policy states that employment "*can be terminated, with or without cause, and with or without notice, at any time, at the option of either the Company or the employee.*" (*Id.*) (italics added).

Therefore, based on the express disclaimers contained in the employment policy and the handbook stating that employment was "at will," the court holds that neither the personnel policies nor procedure manuals could reasonably be construed to constitute an enforceable contract of employment. Consequently, summary judgment is due to be granted on this claim.

### E.  Breach of implied covenant of good faith and fair dealing

The plaintiff next argues that BNSF breached an implied covenant of good faith and fair dealing by its actions. This claim is due to be denied for two reasons. First, the defendant is correct that Alabama does not recognize this type of claim outside insurance claims. *See Lake Martin/Alabama Power Licensee Association, Inc. v. Alabama Power Co.*, 601 So. 2d 942, 945 (Ala. 1992) ("there is no contractual cause of action for breach of an implied duty of good faith that nebulously hovers over the contracting parties"); *Tanner v. Church's Fried Chicken, Inc.*, 582 So. 2d 449, 451 (Ala. 1991); *Government Street Lumber Co. v. Amsouth Bank*, 553 So. 2d 68, 72 (Ala. 1989). Second, there was no contract in this case. In *Hanson v. New Technology,*

47

*Inc.*, 594 So. 2d 96, 99 (Ala. 1992), the Alabama Supreme Court stated, "This Court has

recognized and has noted that 'the obligation of good faith arises as part of the contract' and that

'every contract does imply an obligation of good faith and fair dealing.'" *Hoffman-LaRoche*, 512

So. 2d at 738 (citations omitted.)  In this case, because no contract of employment existed,

Wyant's claim alleging a breach of food faith and fair dealing must fail.  *See Hanson*, 594 So. 2d

at 99.  Consequently, summary judgment is due to be granted the defendant on this claim.

### F. Wrongful discharge

Wyant also alleges that the above-described actions of the defendants constitute a

wrongful discharge.  As a trainmaster, Wyant was an at-will employee of BNSF.  No

employment contract existed between them.  An at-will employment situation may be terminated

by either party at any time, with or without cause or justification.  Wyant will not be able to show

that her discharge was wrongful "because of the rule that an employee's contract for at-will

employment may be terminated by either party with or without cause or justification." *Wyatt v.*

*BellSouth, Inc.*, 757 So. 2d 403, 406 (Ala. 2000) (citing *Hoffman-LaRoche, Inc.*, 512 So. 2d at

728).  Consequently, summary judgment is due to be granted on this claim.

### G. Outrage

The tort of outrage was first recognized by the Alabama Supreme Court in *American*

*Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981).  The Court described the tort of outrage

as follows:

> The emotional distress [caused by the defendant's conduct] must be so severe that
> no reasonable person could be expected to endure it.  Any recovery must be
> reasonable and justified under the circumstances, liability ensuing only when the
> conduct is extreme. [Citation omitted].  By extreme we refer to conduct so
> outrageous in character and so extreme in degree as to go beyond all possible

bounds of decency, and to be regarded as atrocious and utterly intolerable in a
civilized society.

*Potts v. Hayes.*, 771 So. 2d 462, 465 (Ala. 2000) (quoting *Inmon*, 394 So. 2d at 365). The

Alabama Supreme Court in *Potts* noted that "[t]he tort of outrage is an extremely limited cause of

action," so limited, in fact, that it has been "recognized in regard to only three kinds of conduct:

(1) wrongful conduct in the family burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987);

(2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co.
v. Bowen*, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truwal Sys.
Corp.*, 551 So. 2d 322 (Ala. 1989)." *Potts*, 771 So. 2d at 465. In a claim for outrage, a plaintiff

must prove that "the defendant's conduct '(1) was intentional or reckless; (2) was extreme and

outrageous; and (3) caused emotional distress so severe that no reasonable person could be

expected to endure it.'" *Potts*, 771 So. 2d at 465 (quoting *Green Tree Acceptance, Inc. v.
Standridge*, 565 So. 2d 38, 44 (Ala. 1990)).

Wyant bases her outrage claim on the emotional distress she experienced following

BNSF's decision to terminate her from her supervisory position. She alleges that the defendants

wrongfully failed to judge her on the basis of merit and ability and committed deliberate acts of

discrimination and unfair dealing. (Doc. 32 at 12). The defendants argue that summary

judgment is proper on this claim because their behavior does not rise to the level required by

Alabama law in that it was not "so extreme in degree as to go beyond all bounds of decency, or

which could be regarded as atrocious and utterly intolerable in a civilized society." *Inmon*, 394

So. 2d at 368. There is no evidence that the defendants intended to cause Wyant severe

emotional distress. Even assuming that the defendants did intend to inflict emotional harm on

Case 2:00-cv-02163-JE0   Document 40   Filed 06/05/02   Page 50 of 51


Wyant by discriminating against her, Wyant has not provided any evidence that the allegedly discriminatory conduct was sufficiently outrageous to support a claim. Wyant has not sufficiently demonstrated that her emotional distress was "so severe that no reasonable person could be expected to endure it." *Potts*, 771 So. 2d at 465. Finally, the court finds that the alleged acts are not sufficient to meet the requirement that they be "'atrocious and utterly intolerable in a civilized society.'" *Williams v. Williams and Associates*, 555 So. 2d 121, 125 (Ala. 1989) (quoting *Inmon*, 394 So. 2d at 365). Therefore, she has not suffered the requisite level of emotional distress necessary to support an actionable claim for outrage.

Wyant testified that she has been taking Prozac. However, she conceded in her deposition that she had been taking this medication for two or three years prior to her termination. (Wyant Depo. at 44). Wyant continues to seek counseling, yet she has admitted that her purpose for seeing a counselor now is to help her cope with her son's problems. (*Id.* at 47). Wyant claims to have required the services of a chiropractor for stress three times a week for three months and she attributes this stress to her employment at BNSF. (*Id.* at 168). Even assuming that Wyant could link this stress to her employment at BNSF, it is not sufficient to support a claim for outrage. Wyant has presented no evidence that she suffered severe emotional distress as a result of her termination. Consequently, summary judgment is due to be granted the defendants on this claim.

## V. CONCLUSION

Premised on the foregoing, the defendants' motion for summary judgment is due to be granted as to all the plaintiff's claims. An order consistent with this finding will be entered.

**DONE**, this the 5th day of June, 2002.

_____
**JOHN E. OTT**
United States Magistrate Judge